## THE CITIZENS' BANK OF LOUISIANA v. THE LEVEE STEAM COTTON PRESS COMPANY.

It was competent for the State to make such changes in the mode of administration of the insolvent banks, as the public interest required.

The laws which have from time to time been passed for the liquidation of the affairs of the Citizens' Bank of Louisiana, are constitutional.

The decree of forfeiture, pronounced against that bank, did not thereby give the right to the stockholders to insist on an immediate liquidation of its affairs.

The statutes, which provide for a more protracted administration, did not impair the obligation of any contract; nor was the stockholder, in consequence of those statutes, invested with a right to release his property from mortgages which he had created on it.

APPEAL from the Fourth District Court of New Orleans, *Strawbridge*, J. A. Pitot, for the plaintiffs. *John R. Grymes* and *A. K. Josephs*, for defendants. By the court :*

EUSTIS, C. J. This appeal is taken by the defendants, from a judgment rendered against them at the suit of the Citizens' Bank, in the Court of the Fourth District of New Orleans, for the sum of four thousand five hundred and six dollars, with eight per cent interest, from the 1st of May, 1851.

The action was for the recovery of an assessment of one dollar per share on the stock of the bank, which was imposed for the term of seven years, for the purpose of meeting the obligations of the bank within that time. It is not understood that any question is raised concerning this assessment, except that which involves the constitutionality of the legislation, by virtue of which the liquidation of the affairs of the bank has been conducted.

This point has been argued at bar, and we shall proceed at once to give our impressions upon it, without referring more than is necessary to the details connected with it.

The ground on which the constitutionality of this legislation is assailed, is that it impairs the obligation of contracts. The precise point in which the legis-

_____

*Preston, J.*, did not sit in this case.

lation conflicts with the Constitution, is not stated; but the proposition is put on general terms, and it is supposed that the objection will be best met, by considering the constitutionality of this legislation as a whole.

By the forfeiture of the charter of a corporation under the Civil Code, the corporation itself became extinct. Code, article 38 § 2. *The State v. The Orleans Navigation Company*, 7 Annual, (decided in February term 1852.)

But though the corporation was dissolved by a decree of forfeiture, the property of the corporation became vested in its members, and this court held, that courts had the power to appoint persons to liquidate and settle the affairs of an insolvent bank, whose charter had been decreed forfeited, in the absence of any provision by law for that purpose. *Stark v. Burk*, 5 Ann. 741.

The Citizens' Bank is one of the property banks of New Orleans. Its charter was created by two laws, one passed in 1833, and the other in 1836. Under the latter, the bank went into operation, the State issuing its bonds for several millions of dollars. These bonds having been negotiated for the benefit of the bank, its capital was thus provided. The stockholders gave mortgages for the amount of their stock, which were given in order to secure the payment of the capital of the bank thus furnished, and the loans to which they were respectively entitled, as stockholders, under the charter.

The duration of the charter of the bank, was limited to fifty-one years from April 1833.

The Act of 1842, providing for the liquidation of banks, in its first section, reënacted the general provision of the code concerning the effect of the forfeiture of the charters of bank. In the 28th section, it had this clause for the benefit of these banks, in which the State itself was a stockholder, or for which it had issued its bonds: If a decree of forfeiture be rendered against any one of such banks, the corporation shall not be deemed dissolved, but it shall retain all its corporate powers and privileges, with the exception hereinafter mentioned, &c.

The charter of this bank was adjudged to be forfeited under this Act of 1842, and by virtue of this act and of the Act of the 5th of April, 1843, the State had entered into the possession, and the exclusive management of its assets, and took upon itself the administration of its affairs. The corporate existence of the banks, appears to be maintained throughout all the legislation in relation to it.

By the third section of the Act of 1836, authorizing the emission of bonds on the part of the State, in order to provide the capital for the bank, it is provided, that for the guarantee of the bonds thus emitted, all the securities granted, under the act of incorporation, to the holders of its bonds, are hereby transferred to the State and the holders of the bonds to be issued under the Act of 1836. The securities, particularly thus referred to, were the mortgages given for stock, which were to stand as securities for the loan, which was to be made to provide the monied capital of the bank. This section, it will be observed, transfers these securities to the State and the holders of the bonds. As the bonds were to be issued by the State, this clause can have no meaning, except to transfer the securities to the State, as a species of pledge, for the bonds which were to be issued by virtue of the act.

There never was an occasion in the history of this State, in which the active interference of the government was more imperatively called for, than in 1842. A violent convulsion in the monied affairs of the country had taken place. So urgent was the necessity, that a general bankrupt law had been passed to take

THE CITIZENS'
BANK OF
LOUISIANA
*v.*
LEVEE STEAM
COTTON PRESS
COMPANY. effect in that year. The banks in this city, which furnished the ordinary currency, were most of them insolvent, many hopelessly so. There was no provision in the bankrupt act, nor in the statutes of the State, for the liquidation of insolvent corporations. The charters of the two property banks had been violated, and their notes and obligations were in sufferance. In this state of things, the laws were passed, vesting the possession of the assets of these banks in the State, and providing for their administration under its authority, whenever their charters should be judicially decreed to be forfeited, and these banks should not comply with certain conditions imposed by the Act of 1842. Managers were to be appointed by the State, who were to conduct their affairs under the direction of the board of currency. Under the administration of the managers appointed by the State, this institution was conducted until the year 1847, when the administration was changed. Three managers appointed by the State, and three directors chosen by the stockholders, constituted the board entrusted with the affairs of the bank under the law of that year.

We do not perceive in this legislation anything more than the exercise of the power, which the government of the State has over bankrupt estates. This power is inherent in all well regulated governments, under which commerce is regulated. In England, statutory provisions in the nature of bankrupt laws, have been from time to time enacted for more than three centuries, from the reign of Henry VIII to William IV. It was exercised by several of the States before the Constitution of the United States, and the power to pass uniform laws on the subject of bankruptcy, was unanimously conceded to the government of the United States, by the convention which framed the Constitution In almost all the States, insolvent or bankrupt laws are in operation in some form more or less stringent.

Blackstone says, that by virtue of the statutes of bankruptcy, a bankrupt may lose all his estates, which may be at once transferred by his commissioners to their assignees without his participation or consent. 2d Commentaries, 286 and 480.

The power has been frequently exercised in this State, by the enactment of laws for the sequestration of the property of debtors.

If it was competent for the State to provide, by law, for the administration of the property of insolvent banks, the power to make such changes in the mode of administration as the public interest required, we do not think can be drawn in question, under the facts of the present case. The possession asserted by the State of the assets of the bank, was constructive, and for the purpose of putting them beyond the reach of wasteful and destructive litigation. It was administrative and conservativei n its object and character. The affairs of the bank were put in commission under the authority of the State, as any other insolvent estate would be, under ordinary commissioners or syndics.

The present action, as we have stated, was for the recovery of an amount assessed on each share by the managers and directors of the bank, under the new administration, organized under the Act of 1847. The first series of the State bonds, due in 1850, could not be met by the bank; and an agreement was made with the holders, by which the payment was extended to five annual installments, and more than half a million of arrears of interest was funded in seven annual payments. By the Act of 1847, it was made the duty of the managers to exact from the stockholders, such an annual contribution, as would form a fund sufficient to meet regularly the payments due on the bonds of the State. By a resolution of the board, a call was made on the stockholders, for

this object, of seven dollars per share, payable from one to seven years, in the
sum of one dollar per share.

It is contended, on behalf of the defendants, that they have a right to insist on
an immediate liquidation of the affairs of the bank, and cannot be compelled to
submit to this protracted administration imposed by the Legislature, and have
a right to have their property released from the burden of their mortgages.

A view of the situation of the bank shows, that an immediate liquidation of
its affairs is impossible.

In 1836, the State issued its bonds, to the bank, for upwards of seven millions
of dollars, one fifth of which were payable in the years 1850, 1859, 1868, 1877
and 1886. Coupons of interest were attached to each bond, made payable in
London and in Amsterdam. The first series of bonds amounting to $1,279,557
14, fell due in 1850, which the bank could not pay, and for which no pro-
vision was made by the State. Besides this amount in sufferance, the arrears
of interest due on the bonds, amounted, in 1849, to no less than the sum of
$883,736 43, a portion of which was funded, as has been before stated. When
it is considered that so large a portion of the capital of the bank is, by its
charter, loaned out on mortgage to the agricultural interest, it is obvious that the
available means of the bank at any future period, must be attended with uncer-
tainty, and that an immediate realization of its assets is impossible.

The extension of the term of payment of the series of the bonds for five
years, in annual installments, was authorized by the Act of 1847, and it seems
obvious that, in the presence of facts like these, an administration of so weighty
and complicated a character as this, ought not to be disturbed, except in the
furtherance of a clear and well defined right.

Being of opinion that there is nothing unconstitutional in this legislation, we
see no legal grounds for the refusal, on the part of the defendants, to pay the
contribution imposed, in order to meet the engagements of the bank, to which
they bound themselves, by their original obligations, for stock.

As the only question argued at bar was that on which this opinion is given,
we have refrained from touching any other subject relating to the defence. The
case presents a variety of phases, under which we have considered it in our
deliberations, but none of them can sustain the present defence.

The judgment of the district court is therefore affirmed, with costs.